UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAMELA YOUNG,                          )
                                       )
        Plaintiff,                     )
                                       )
    vs.                                )        Case No. 4:13CV426 CDP
                                       )
CAROLYN W. COLVIN,                     )
Acting Commissioner of Social Security, )
                                       )
        Defendant.                     )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Pamela Young's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et*

*seq*. Young claims she is disabled because she suffers from depression and panic

attacks, obesity, allergic rhinitis, asthma, and problems with her left shoulder and

foot. After a hearing, the Administrative Law Judge concluded that Young was not

disabled. Because I find that the ALJ's decision was based on substantial evidence

on the record as a whole, I affirm.

## I.    Procedural History

Young filed an application for disability insurance benefits in June 2010.

She alleged an onset date of September 1, 2008. When her application was denied,

she requested a hearing before an administrative law judge.  Young then appeared with counsel at an administrative hearing September 21, 2011.  Young and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Young's application, and she appealed to the Appeals Council.  On January 11, 2013, the Council denied her request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Young now appeals to this court.  She argues that the ALJ's finding of non-disability is not supported by substantial evidence, specifically because (1) the ALJ's findings as to Young's residual functional capacity – particularly with regard to her mental impairments and shoulder problems – were not supported by "some medical evidence" as required and (2) the hypothetical question posed to the vocational expert did not capture the concrete consequences of Young's impairment, and therefore, the expert's response did not constitute substantial evidence upon which the ALJ's decision could rest.

## II.   <u>Evidence Before the Administrative Law Judge</u>

### <u>*Medical Records Before Period of Alleged Disability*</u>

According to medical records before the ALJ, Young saw psychiatrist Thomas Nowotny half a dozen times in 2007.  At what appears to be their first

appointment, in January 2007, Dr. Nowotny diagnosed Young with major depression and seasonal affective disorder. At the time, Young was grieving over her sister's illness and having trouble with her sleep, appetite, energy, and mood. (Tr., pp. 221–22.) Throughout 2007, she continued to report similar symptoms, including irritability, shakiness, and weakness, but saw some improvements with medications. (*See, e.g.*, Tr., pp. 214, 218, 220, 223–25.) Young also saw allergist Michele Kemp once in 2006 and once in 2007. Dr. Kemp diagnosed Young with allergic rhinitis and bronchial asthma. (Tr., p. 297.) A list of Young's medications from July 2007 shows she was taking Singulair, Premarin, Effexor, and Trazadone every day, as well as Flovent and Albuterol as needed.[1] Dr. Kemp noted that Young found Singulair to be "wonderful" and that generally, she was "doing well," though she continued to grieve over her sister, with whom she was very close.

Young also continued to see her primary care physician, Dr. Carl Baker, in 2007 and 2008. (*See* Tr., pp. 232, 249.) Dr. Baker diagnosed her with bronchial asthma and a stress disorder. Lab work done in 2007 and 2008 showed that

---

[1] Singulair is used to treat or prevent wheezing and shortness of breath associated with asthma. Premarin is an estrogen mixture usually used to treat symptoms of menopause. Effexor is a serotonin-norepinephrine reuptake inhibitor used to treat symptoms of depression. Trazadone is also used to treat depression, particularly symptoms of anxiety and insomnia related to depression. Flovent and Albuterol are both inhaler-based medications used to treat asthma. WebMD, "Drugs and Vitamins Search," http://www.webmd.com/drugs (last visited March 6, 2014).

Young had high cholesterol.  She was prescribed fish oil and a low-cholesterol diet.  (Tr., pp. 247, 250.)

On August 18, 2008, shortly before Young's alleged onset date, she saw psychiatrist Nowotny.  Dr. Nowotny noted that he had increased Young's prescription of Effexor for symptoms of crying about her sister's death.  He also noted that she had difficulty at home because "her mother and grand niece bicker constantly."  According to Dr. Nowotny's notes, Young's speech was regular and her flow of thought was logical and sequential.  Her thought content was devoid of psychosis or suicidal or homicidal ideation.  Her mood was "nervous."  (Tr., p. 212.)

### *Medical Records During Period of Alleged Disability*

Young alleged a disability onset date of September 1, 2008.  On November 4, 2008, she saw Dr. Kemp, her allergist.  (Tr., p. 298.)  Dr. Kemp wrote that Young had "good control" of her asthma and that the Singulair was "wonderful."

On January 13, 2009, Young saw psychiatrist Nowotny, who noted that Young was "doing well" and her mood was "good."  He assigned a GAF score of 90.  The remainder of his notes from that appointment are illegible.  (Tr., p. 210.)  Young next visited Dr. Nowotny in June 2009.  He wrote that she was "doing well" in regard to her depression symptoms and that she should continue with her

medications. Young's mood was good, her flow of thought was logical and sequential, and her GAF score was 90. (Tr., p. 209.)

In March 2009, Young visited an urgent care center associated with St. Anthony's Medical Center. She was diagnosed with acute bronchitis and discharged with prescription medication. In August 2009, Young returned to the urgent care center complaining of pain in her ears and throat. She was discharged with serous otitis media,[2] but three days later, she came back to the urgent care center, indicating that her symptoms had worsened. She was discharged with pharyngitis and prescribed medication. (Tr., p. 274.)

In September 2009, Young underwent a stress test so she could be cleared for bladder surgery. The test showed no evidence of ischemia and normal left ventricular systolic function. (Tr., p. 242.) That same month, Young also visited Dr. Baker, her primary care physician, complaining of an earache. (Tr., p. 230.)

On October 3, 2009, Young visited the St. Anthony's urgent care center complaining of pain in her left foot. She had twisted her foot while walking. Her foot was bruised and swollen, and she experienced increased pain with ambulation. The clinical impression was a foot sprain. An X-ray showed "soft tissue swelling

---

[2]  Serous otitis media is "chronic [inflammation of the middle ear] marked by serous effusion into the middle ear." Dorland's Illustrated Medical Dictionary 1351 (32d ed.2012).

without visible bony pathology." (Tr., p. 280.) Young was discharged the same day with an air splint and prescription medication.

On December 16, 2009, Dr. Nowotny noted at a visit that Young was "doing well" and "stable." (Tr., p. 208.) Her diagnosis was major depression and her GAF score was 90.

Several months later, in March 2010, Young saw her primary care physician, Dr. Baker. She complained of feeling very hot and claustrophobic the night before. Dr. Baker diagnosed panic attacks and a stress disorder. (Tr., p. 229.) Follow-up lab work showed that Young had a high white blood cell count, high hematocrit, high glucose, and high cholesterol. (Tr., p. 240.)

Young visited the St. Anthony's urgent care center twice in May 2010, complaining of ear pain. Although she had been prescribed Medrol, she had no relief of her symptoms. She was diagnosed with acute sinusitis and serous otitis media. (Tr., pp. 281–87.)

On July 20, 2010, Young had a follow-up appointment with Dr. Kemp, her allergist. She reported using her asthma medication two or three times per day and that she could not go upstairs without experiencing shortness of breath. According to Dr. Kemp's notes, Young "can't work in office" because of exposure to cologne

and perfume.  (Tr., p. 299.)  Young was taking Singulair, Elestat,[3] and possibly Flovent every day, as well as Albuterol as needed.  As at other visits, Dr. Kemp conducted pulmonary function testing, which showed a FEV1 value of 80%.[4]

At a September 2010 visit, Dr. Baker diagnosed Young with depression.  His notes indicate that Young wanted to discontinue her Effexor prescription.  (*See* Tr., pp. 327, 329.)  Young saw Dr. Baker two months later, in November 2010, complaining of a cough and back pain.  Dr. Baker diagnosed Young with acute bronchitis and an upper respiratory infection.  (Tr., p. 325.)  A chest X-ray was unremarkable.  (Tr., p. 324.)  On December 27, 2010, at an appointment with Dr. Baker, Young complained of anxiety, claustrophobia, and feeling like she wanted to scream.  Dr. Baker prescribed Prozac.[5]  (Tr., p. 323.)

In January and February 2011, Young followed up with orthopedic surgeon Dr. Jeffrey Weltmer for numbness in her left foot.  According to Dr. Weltmer's notes, Young reported that it was not "horrible" or "incapacitating," but had continued since she twisted her foot in October 2009 and it still bothered her.  The

---

[3]  Elestat is an antihistamine used to prevent itching of the eyes caused by allergies.  WebMD, "Drugs and Vitamins Search," http://www.webmd.com/drugs (last visited March 6, 2014).

[4]  Forced expiratory volume 1 ("FEV1") is the maximal volume that can be expired in one second when starting from maximal inspiration. In obstructive lung disease, the FEV1 is usually decreased.  A normal FEV1 is eighty percent and above. *See Stedman's Medical Dictionary* 2140 (28th ed. 2006).

[5]  A letter from Dr. Baker dated October 6, 2010, indicates that Young needed to take Prozac once per week for one month to successfully transition off Effexor.  (Tr., p. 327.)  The letter appears to be intended for Young's insurance company.

numbness and tingling worsened with activity. There was no bruising, swelling, or giving way. Examination found that Young had good pulses on her foot and that sensation was present with some subjective numbness in the dorsal aspect of the foot and irritation of her superficial peroneal nerve dorsally. (Tr., p. 343.) According to a patient history form Young filled out, she was taking Premarin, Prozac, Singulair, and Albuterol. (Tr., p. 344.) Dr. Weltmer prescribed Naprosyn, but when Young reported no relief, he changed her prescription to Neurontin.[6] Young reported similar problems in her left humerus and both her legs when she stood up, but examination of her legs and arm were unremarkable. (Tr., p. 342.)

At another follow-up visit with Dr. Weltmer on March 14, 2011, Young reported a "new problem." According to Dr. Weltmer's notes, Young's left should had been "getting progressively worse over the last few months. The last few weeks, it has been much more significant. It does not hurt when she pushes anywhere on it. It just hurts to move it." (Tr., p. 341.) An examination revealed tenderness with attempted external rotation and the "empty can test."[7] External rotation was 15 degrees less than on the right side and forward flexion was 20 degrees less. Dr. Weltmer's impression was left rotator cuff tendinopathy. He

---

[6] Naprosyn is a non-steroid anti-inflammatory drug (NSAID) used to treat palin. Among other things, Neurontin is used to treat nerve pain. WebMD, "Drugs and Vitamins Search," http://www.webmd.com/drugs (last visited March 6, 2014).

[7] The empty can test assesses injury to the supraspinatus muscle or superior labrum of the shoulder joint. 2 Dan J. Tennenhouse, *Attorney's Med. Deskbook* § 18.4 (4th ed. 2006).

discussed treatment options with Young.  She did not want anti-inflammatory medication or a cortisone injection.  Dr. Weltmer sent her for an MRI to evaluate her left shoulder.

On March 25, 2011, Young saw Dr. Baker.  She complained of left arm pain and a rash under her armpit.  She could not move her left arm, but she had been unable to do the MRI.[8]  Dr. Baker diagnosed Young with bronchial asthma and peripheral neuropathy[9] and called Dr. Weltmer.  (Tr., p. 322.)  On April 8, 2011, an X-ray of Young's left shoulder showed a subacromial spur.  (Tr., p. 331.)

On April 13, 2011, Young saw Dr. David Fagan, another orthopedic surgeon.  Young had not been able to tolerate either the MRI or an arthrogram, so he was unable to provide a definitive diagnosis.  She reported that she could not reach overhead without a considerable amount of pain.  Dr. Fagan's examination showed significantly decreased range of motion, particularly with external and internal rotation, as well as abduction.  Dr. Fagan noted that there were "[n]ot a lot of arthritic changes visible on X-ray."  His impression was a frozen shoulder.  He recommended physical therapy and some other courses of action if the therapy was not successful.  (Tr., p. 339.)

---

[8]  At the hearing before the ALJ, Young clarified that she was unable to do an MRI because it required laying on her back for 30 minutes and her asthma prevented that.  After Dr. Baker prescribed Lorazepam, she was able to tolerate the procedure.  (*See* Tr., p. 40.)

[9]  Peripheral neuropathy is a disorder affecting the peripheral nervous system. *Stedman's Medical Dictionary* 1313 (28th ed. 2006).

On May 18, 2011, Young had an appointment with Dr. Baker. She complained of a dry cough and chest congestion.[10] Dr. Baker assessed a frozen shoulder, back problems, and an upper respiratory infection. (Tr., p. 319.)

Young saw orthopedic surgeon Dr. Fagan again on May 27, 2011. She was not in acute distress but her shoulder was still painful. Her external and internal rotation were somewhat improved from the last examination. Dr. Fagan indicated that Young was more likely suffering from a rotator cuff tear or tendinitis rather than a frozen shoulder. (Tr., p. 338.) An MRI completed later than week showed a "motion artifact creating a mild degree of limitation," but no evidence of a rotator cuff tear. There was a small amount of fluid in Young's subdeltoid bursa. (Tr., p. 332.) Young received a cortisone injection in May, and another in June at a follow-up visit with Dr. Fagan. At that visit, Young complained of pain when she tried to do overhead activities. Examination showed a positive impingement sign[11] and a positive supraspinatus test.[12] (Tr., p. 318.)

In July 2011, Young had two appointments with Dr. Baker. At the first appointment, Young reported needing allergy medication and Ambien. Dr. Baker diagnosed Young with depression, canker sores, insomnia, allergies, and bursitis of

---

[10] Most of Dr. Baker's treatment notes from this appointment are not legible.
[11] Positive impingement signs are demonstrated in patients with rotator cuff tendonitis or tendinosis within the subacromial space by pain elicited in physical examination. *Stedman's*.
[12] This is another name for the "empty can" test.

the left shoulder.  (Tr., p. 317.)  At the second appointment, Dr. Baker noted

Young's stress disorder and prescribed Effexor again.

On September 9, 2011, Young saw allergist Dr. Kemp.  A pulmonary

function test showed a mild restriction before medication and a significant

improvement after taking Albuterol.  According to Dr. Kemp's treatment notes,

"[Young] is requesting disability, and has been deemed capable of performing data

entry, but will develop a severe cough around all irritants, especially perfumes, in

her work environment.  She does continue to feel that the Singulair has been

extremely effective."  (Tr., p. 360.)  Dr. Kemp's impression was allergic rhinitis,

bronchial asthma "greatly exacerbated by irritants," and "difficulty functioning

because of allergies, sensitivity to irritants, requesting disability."  (*Id.*)  She noted

that allergy skin testing had reveled severe sensitivity to aeroallergens.  The testing

results show that Young had very strong reactions to most allergens, including dust

mites, pet hair, different types of tree pollen and molds, grass pollens, and

ragweed.  (Tr., p. 361.)  Dr. Kemp recommended an irritant-free work

environment.

At a February 2012 visit, Dr. Fagan noted that Young continued to show a

positive impingement sign and a positive supraspinatus test as to her left shoulder.

His impression was acromioclavicular arthritis and bursitis.  He also noted that she

had plantar fasciitis of the right foot and arthritis in one of her fingers. Dr. Fagan gave Young a Depo-Medrol shot to her left shoulder. (Tr., p. 365.)

### *Environmental Limitations Questionnaire*

Dr. Kemp completed an environmental limitations questionnaire.[13] She listed her diagnoses as allergic rhinitis, bronchial asthma, and "disability related to exposure to irritants," which she based on Young's history and pulmonary function tests. She checked "no" in response to the question "Is your patient a malingerer?" She indicated that Young's symptoms would "frequently" interfere with the attention and concentration needed to perform even simple work tasks. Dr. Kemp indicated that Young was capable of low-stress jobs. She wrote that Young's impairments were likely to cause good days and bad days and Young could be expected to miss more than four days per month "if around irritants, perfumes." Dr. Kemp recommended that Young avoid all exposure to cigarette smoke, perfumes, soldering fluxes, solvents and cleaners, fumes, odors, gases, dust, and chemicals, as well as avoiding even moderate exposure to extreme cold and heat, high humidity, and wetness. (Tr., pp. 358–59.)

---

[13]  The questionnaire itself is undated, but it is sandwiched between other documents from a September 9, 2011 visit between Young and Dr. Kemp.

## *Work Reports*

Young completed a work activity report on June 16, 2010. She wrote that she had worked as a leasing manager from March 1, 2008 to September 1, 2008, but had to stop working because of her medical condition. According to her disability report, she also worked as an apartment manager from 2000 to 2004, and she did data entry from 1995 to 1998. She reported that she had to quit her leasing manager job because many of the residents who came to her office to sign leases wore perfumes and colognes that exacerbated her allergies and asthma. She also reported having to change locations while doing data entry because one of her co-workers wore too much cologne. She wrote that her asthma and allergies got worse when she was stressed or outside.

On August 30, 2010, Young filled out another disability report. Among other things, she wrote that she was not able to do data entry anymore because of arthritis in her finger. (*See* Tr., pp. 138–47, 151–59, 171–84, 188–94.)

## *Function Report*

According to Young's function report, completed June 25, 2010, she lived with her husband and mother. She described her day as doing household chores, watching television, taking her mother to the hairdresser once per week, going grocery shopping, and conversing with her mother. She could no longer walk for

work and for exercise, wear cologne, turn off her air conditioning, or dust, like she could before she was ill. She could prepare meals but became "worn out" more easily and then could not eat. Young could not work outdoors and had allergies to dust, trees, grass, flowers, and mold. She did not go outside often because of allergens and would "end up with infected ears or respiratory infections."

Young described reading magazines and newspapers, seeing her grandchildren, having coffee with a neighbor, spending holidays with her daughter at her daughter's home, and playing a card game with family. Young reported that she had problems walking outside and climbing stairs and became short of breath easily. She wrote that she could walk about two blocks as long as she had a cold rag over her mouth and cotton in her ears. She missed being outside often and was embarrassed about the hacking and coughing noises she made. Her allergies and asthma affected her sleep because she had to cough and blow her nose almost every night. Young wrote that she got along "very well" with authority figures, had never been fired because of problems getting along with others, and handled changes in routine very well. She reported that she did not handle stress well. (Tr., pp. 160–67.)

### *Physical Residual Functional Capacity Assessment*

State consultant Crystal Thele completed a physical RFC assessment on August 17, 2010.  She found that Young had the following exertional limitations: she could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; stand, walk, or sit for up to six hours in an eight-hour work day; and engage in unlimited pushing and pulling.  Young could frequently stoop, kneel, crouch, crawl, balance, and climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds. She had no visual, manipulative, or communicative limitations.  Thele found that Young should avoid concentrated exposure to extreme heat and cold, humidity, and fumes, odors, dusts, gases, and poor ventilation.  Thele also found that Young could work with unlimited exposure to wetness, noise, vibration, or hazards.  She noted that Young had alleged disability due to allergies and asthma, had not required inpatient treatment for an asthma exacerbation in the past year, and scored relatively well on pulmonary function tests.  Thele found Young to be "mostly credible" but that "she should be able to perform work as indicated" in the RFC. (Tr., pp. 58–63.)

### *Psychiatric Review Technique*

State consultative psychologist Gretchen Brandhorst completed a psychiatric review technique for Young on August 24, 2010.  She assessed Young for affective

disorders and anxiety-related disorders, specifically major depressive disorder, seasonal affective disorder, stress disorder, and panic attacks. Brandhorst found no restrictions in any of the four areas of function: restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation. Brandhorst found that Young was credible and her mental health impairments were non-severe. Among other things, Brandhorst noted that Young had not alleged mental difficulties or marked any mental impairment when describing her activities of daily living. Brandhorst also noted that improvement in Young's symptoms was reported in her doctors' treatment notes and that she had had follow-up appointments in which she did not report mental health concerns. (*See* Tr., pp. 303–313.)

### *Testimony at the September 21, 2011 Administrative Hearing*

Young testified at the hearing before the ALJ. She stated that she lived with her husband and her 41-year-old niece. Her mother had recently passed away. She testified that she was 5'5" and 214 pounds. Young had received her high school diploma and reported no problems with reading, writing, or doing simple arithmetic. Sometimes reading materials could cause her hands to itch, so she would "hurry up and read it and then wash [her] hands." (Tr., p. 32.)

– 16 –

Young stated that she had been a leasing manager until September 2008. In exchange, she was able to get her apartment and utilities for free. She was also paid by commission, based on how many new leases and renewals she signed up per month. Before that, she had worked as an apartment manager, where she was in charge of leasing as well as meeting with contractors. Young testified that she had held several jobs in data entry before managing apartments. (Tr., pp. 35–37.)

When the ALJ asked Young to describe the medical conditions that impacted her work, she first listed her allergies, which she had had since birth but had gotten worse. Young testified that she just could not cope anymore. She also described bursitis in her left shoulder, peripheral neuropathy in her left foot, and arthritis in her hand. Young stated that she had gotten shots in her left shoulder and "just [couldn't] go backwards." (Tr., p. 39.) She also testified that her shoulder hurt when it rained. The ALJ asked Young about her anxiety disorder. She testified that she was no longer seeing Dr. Nowotny:

> I did but I don't now. I stopped going to him. My sister passed away and it was pretty hard on me because we were real close. And he said I'll probably be on it for a long long long long time and after four years I thought, I need to get off of it, I just hate drugs.

(Tr., p. 41.) Young stated that Dr. Baker had now prescribed Paxil for her anxiety. She testified that she was also taking Ambien. She stated that she had no side effects from her medications. Her orthopedist had prescribed a medication for her

foot but it gave her excruciating pain in her back so she had stopped taking it. (Tr., p. 45.)

Young stated that she could not vacuum, dust, or take the trash out, and that her niece helped her with household chores. She went out to eat regularly but if she was around someone wearing cologne, she would leave or move away. Young testified that she could walk for about an hour without needing to rest. It was "getting tough" to lift a gallon of milk. (Tr., p. 47.)

Young testified that she had problems with her nose every day. She stated:

> in fact, I feel like I'm drowning, it's in my nose and throat and my chest, just all from the allergies and nothing helps me but I take my Singulair and my pipe, my albuterol and I've got eye drops. Dr. Kemp is pretty good helping me but it's tough.

(Tr., p. 48.) She testified that she did not think she would be capable of working the jobs she had had in the past because she couldn't "be around the elements." She pointed out a dusty table and stated "see the table, that kills me. It takes my air." (*Id.*) Young stated that she loved managing apartments, but she could not go up and down the steps without being out of breath. Sometimes in the summer, she could not even go from her car to her apartment without a cold rag over her mouth.

Vocational expert Delores Gonzalez also testified before the ALJ. Gonzalez stated that leasing manager is classified as light semi-skilled work; apartment building manager is light skilled work; and data-entry clerk is sedentary semi-

skilled work. The ALJ asked Gonzalez to consider a hypothetical individual with Young's education, training, work experience, and alleged onset date who could do medium work; climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds; would have to avoid concentrated exposure to extreme cold and heat, humidity, wetness, fumes, odors, dust and gas; and who was limited to pushing and pulling frequently with her left arm. Gonzalez stated that, according to the Dictionary of Occupational Titles, such an individual could not perform work as a leasing manager because of exposure to weather. However, that individual could work as a building manager or as a data-entry clerk. (Tr., p. 53.) When the ALJ changed the hypothetical to limit the individual to light work, the same jobs were available. Gonzalez testified that those same jobs were still available when the ALJ restricted the individual to avoiding even moderate exposure to extreme cold, heat, wetness, humidity, fumes, odors, dust, and gas. The ALJ asked Gonzalez whether there were jobs available for a hypothetical individual with the same limitations who would need to work out of her home because of allergies. Gonzalez testified that such a person could work as an addresser, which was an unskilled position, or as a data-entry clerk. She stated that only ten percent of data-entry jobs would accommodate at-home work. Finally, the ALJ asked Gonzalez to consider whether a person with the most restrictive limitations he had mentioned

would be able to work if she had to miss at least two days per month due to allergies. Gonzalez testified that "at that rate of absenteeism the person would have great difficulty maintaining employment." (Tr., p. 56.)

### III. Standard for Determining Disability Under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If so, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, she is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

<u>*Evaluation of Mental Impairments*</u>

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a. As relevant here, the procedure requires an ALJ to determine the degree of functional loss resulting from a mental impairment.  The ALJ considers loss of function to four capacities deemed essential to work.  20 C.F.R. § 404.1520a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more. *See* 20 C.F.R. § 404.1520a(c)(4).

## IV.   **The ALJ's Decision**

The ALJ first determined that Young met the insured status requirements throughout the period of alleged disability and that she had not engaged in any substantial gainful activity since the onset date.

At the second step, the ALJ determined that Young had the severe impairments of obesity, allergic rhinitis, asthma, a left shoulder spur, and superficial peroneal neuritis in the left foot. He found that any arthritis in Young's hand was not medically determinable because there was no record evidence from an acceptable medical source to support her allegation. The ALJ also noted that Young had received treatment for depression and anxiety, but that these conditions were non-severe.

Considering the four functional areas as required in cases where a claimant alleges a mental impairment, the ALJ found that Young had no limitation in the

areas of activities of daily living, social functioning, or concentration, persistence, or pace, and that Young had had no episodes of decompensation. In support of these findings, the ALJ noted that Young could independently care for herself, prepare simple meals, complete some household chores, drive, visit with her grandchildren and other family members, shop, read, watch television, and dine out. She had reported no difficulties with memory, concentration, or completing tasks as a result of her impairments, and she had never been fired or laid off. The ALJ gave great weight to the opinion of an agency psychological consultant, which he found to be "consistent with the preponderance of the evidence of record regarding the claimant's mental status and functioning." (Tr., p. 14.)

Proceeding to the third step, the ALJ determined that none of Young's impairments met or medically equaled a listing.

At step four, the ALJ found that Young had the RFC to perform light work, except with only occasional climbing of stairs and ramps; no climbing of ladders, ropes, or scaffolds; only frequent pushing and pulling with her left arm; and not even moderate exposure to extreme cold and heat, wetness, fumes, odors, dust, gases, and humidity. The ALJ found that, although Young had testified that her asthma and allergies had worsened in recent years, "the medical evidence shows no marked deterioration in her respiratory functioning which cannot be controlled

with medication." (Tr., p. 17.)  The ALJ wrote that Young's medically determinable impairments could reasonably be expected to produce the symptoms he alleged, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the assessed RFC.

In support of his finding, the ALJ noted that the daily activities Young described belied her claim of disability.  For example, Young cared for herself and, until September 2011, her late mother.  Young took her mother to the hairdresser and the doctor and frequently dined out.  She lived in a carpeted apartment despite her doctor's recommendation because as a renter, she had no control over her space.  Treatment notes indicated that she was doing well, her Singulair prescription was "wonderful," and her spirometric pulmonary function tests only showed mild restriction.  Medical evidence of Young's musculoskeletal impairments, including improved external and internal rotation of her left shoulder, an MRI that showed no sign of a rotator cuff tear, and an inconclusive examination of her foot, was inconsistent with allegations of disability.

In determining Young's RFC, the ALJ gave great weight to allergist Dr. Kemp's findings regarding Young's environmental limitations.  But he gave little weight to her opinion of Young's ability to function in a workplace because "Dr.

Kemp's conclusions are extreme in view of her own clinical and diagnostic findings of mild respiratory restriction."  (Tr., p. 18.)

After determining Young's RFC, and relying on the testimony of the vocational expert, the ALJ found that Young could perform her past relevant work as a building manager and a data-entry clerk.  He noted that she had held these jobs long enough to learn how to do them.

## V.    <u>Standard of Review</u>

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.  Discussion

Young argues that the ALJ's opinion is not supported by substantial evidence for two reasons: (1) his findings as to Young's residual functional capacity – particularly with regard to her mental impairments and shoulder problems – were not supported by "some medical evidence" as required and (2) the hypothetical question posed to the vocational expert did not capture the concrete consequences of Young's impairment, and therefore, the expert's response did not constitute substantial evidence upon which the ALJ's decision could rest. I will address each of Young's arguments in turn.

**A. _The ALJ's RFC Findings Are Supported by Sufficient Medical Evidence_**

Residual functional capacity "is the most [a person] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545, 416.945. Although the ALJ must determine a claimant's RFC "based on all relevant evidence," _Roberts v. Apfel_, 222 F.3d 466, 469 (8th Cir. 2000), the RFC is a medical question. Therefore, some medical evidence must support the determination of the claimant's RFC. _Lauer v. Apfel_, 245 F.3d 700, 704 (8th Cir. 2001). An ALJ "should obtain medical evidence that addresses the claimant's ability to function in the workplace." _Id._ (internal quotation omitted). However, although an ALJ must determine a claimant's RFC based upon all relevant evidence, the claimant bears the burden of establishing her RFC. _Goff v. Barnhart_, 421 F.3d 785, 790 (8th Cir. 2005).

In this case, the ALJ's RFC finding that Young could perform light work if she avoided even moderate exposure to extreme cold and heat, wetness, fumes, odors, dust, gases, and humidity was supported by some medical evidence. For example, repeated pulmonary function tests showed that Young had only mild air flow restriction that was successfully treated with Albuterol. (_See_ Tr., pp. 301, 302, 356–57.) Treatment notes from Dr. Kemp indicate that Young had "good control" of her asthma as of November 4, 2008, two months after the alleged onset date. (Tr., p. 298.) Although Young sought treatment at an urgent care center for

ear pain, upper respiratory infections, and bronchitis, there is no evidence that Young was ever hospitalized or required emergency treatment for asthma, allergies, or other breathing problems. Each time, she was prescribed medication and discharged. *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996) (conditions that can be treated with medication are not disabling). Furthermore, the ALJ was entitled to consider the physical RFC assessment by the nonexamining state consultant, who found Young had fewer limitations than those imposed by the ALJ. *See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (opinion by nonexamining physician, when relied on along with independent analysis of medical evidence, can constitute substantial evidence to support ALJ's RFC determination).

### *Dr. Kemp's Environmental Limitations Questionnaire*

Young also appears to argue that the ALJ improperly rejected some of Dr. Kemp's opinions as described in the environmental limitations questionnaire. But the ALJ accepted, in large part, the findings Dr. Kemp made that were directly related to Young's environmental limitations. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (Social Security Administration "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). The ALJ gave

little weight to Dr. Kemp's opinion of Young's ability to function in a workplace because "Dr. Kemp's conclusions are extreme in view of her own clinical and diagnostic findings of mild respiratory restriction." (Tr., p. 18.) For example, Dr. Kemp reported that Young's symptoms would "frequently" interfere with the attention and concentration needed to perform even simple work tasks. But Young had never complained of these symptoms to Dr. Kemp or any other treating physician. It was appropriate for the ALJ to reject this portion of Dr. Kemp's opinion because it was not supported by the record. *See, e.g., Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir.2003) (treating physician's opinion is entitled to controlling weight if it is supported by acceptable clinical and diagnostic data and consistent with other substantial evidence in record); *Stormo v. Barnhart*, 877 F.3d 801, 805 (8th Cir. 2004) (conclusory statement by treating doctor not entitled to controlling weight); *Tuttle v. Barnhart*, 130 Fed. Appx. 60, 62 (8th Cir. 2005) (per curiam) (ALJ properly incorporated parts of treating physician's opinion and rejected limitations that were inconsistent with relatively mild examination findings).

### *Depression and Anxiety*

Young contends that the decision lacked the requisite medical evidence to support the ALJ's finding that Young's mental impairments were non-severe. She

points to her complaints of symptoms such as crying, irritability, and claustrophobia before and during the alleged disability period, diagnoses of panic attacks, major depression, and a stress disorder, and treatment with prescription medications.

An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a). It is the claimant's burden to establish that her impairment or combination of impairments are severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

I find that there was substantial evidence to support the ALJ's finding that Young's mental impairments were not severe, including the requisite medical evidence. At visits in January, June, and December 2009, Young's treating psychiatrist, Dr. Nowotny, noted that she was "doing well." (Tr., pp. 208–210.) At each visit, he assessed a GAF score of 90, which, according to Dr. Nowtny's own treatment forms, meant Young had "minimal symptoms." *See Halverson v. Astrue*, 600 F.3d 922, 930–31 (although they are not dispositive, GAF scores may be considered in determining a claimant's RFC). At the January and June 2009 visits, Dr. Nowotny wrote that Young's mood was good. In December 2009, Dr. Nowotny remarked that Young was "stable." (Tr., p. 208.)

In addition, a state consultative psychologist concluded that Young's mental impairments did not impair any of the four broad functional areas. *See* 20 C.F.R. 404.1520a(c)(3), 416.920a(c)(3), 404.1520a(d)(1), 416.920a(d)(1). Furthermore, Young stopped seeing Dr. Nowotny – or any mental health professional – after December 2009, instead receiving medication from her primary care physician. She sought no treatment for her mental health impairments whatsoever between December 2010 and July 2011. *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability."). On her function report, Young did not allege that she had difficulty with any of the listed mental-health-related tasks, such as concentration, understanding, completing tasks, or getting along with others. (*See* Tr., p. 165.)

When considered altogether, this constitutes substantial evidence – including some medical evidence – to support the ALJ's finding that Young's depression and anxiety were non-severe. *See, e.g., Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011) (diagnosis alone does not mean a claimant's mental impairment is "severe"); *Masterson v. Barnhart*, 363 F.3d 731, 737–38 (8th Cir. 2004) (holding that the

ALJ properly relied on the assessments of a non-examining physician, along with other evidence, in determining the RFC at step four).

### *ALJ's Finding that Young Could "Frequently" Push and Pull With Her Left Arm*

The ALJ found Young was capable of "light work" with some additional limitations.[14]  Although the ALJ determined that Young's left shoulder spur constituted a severe impairment, he found that Young was capable of pushing and pulling with her left arm "frequently," or up to two-thirds of an eight-hour workday.  Young argues that the determination that she could push and pull frequently "cannot withstand minimal scrutiny" as there is "absolutely no rationale relevant to this limitation and . . . no medical evidence to support" it.

The earliest mention in the record of Young's left shoulder impairment is in March 2011, more than two and a half years after her alleged onset date.  Dr. John Weltmer, an orthopedic surgeon Young had been seeing for foot numbness, called the shoulder issue "a new problem" that Young said had been "getting progressively worse over the last few months."  (Tr., p. 341).  Young did not

---

[14]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

mention any limitation with her shoulder in her function report, and there is no evidence – medical or otherwise – that Young sought treatment for her shoulder impairment before March 2011. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (failure to seek treatment may indicate the relative seriousness of a medical problem). Under the regulations, a disability must last or be expected to last at least twelve months, which Young's shoulder pain had not done by the time the ALJ rendered his decision. Where there are long intervals of time within the period of alleged disability where a claimant does not seek any treatment for an impairment, that weighs in favor of a finding of non-disability. *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (claimant's infrequent treatment record supported ALJ's determination that his impairments were non-severe).

In addition, although orthopedic surgeons Weltmer and Fagan discussed with Young several options for treatment, including anti-inflammatory medications and physical therapy, she declined treatment for several months after she first complained of shoulder impairment. (*See* Tr., pp. 339, 341.) Despite the lack of treatment, Young's shoulder rotation improved. (*See* Tr., p. 338.) Eventually, Young received three cortisone shots over the course of nine months, and they gave her "some relief." (Tr., p. 365.) Where a claimant's condition improves without treatment, or where a claimant seeks only minimal treatment, her

impairment cannot be said to be disabling. *See, e.g., Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (inconsistent and conservative treatments are inconsistent with disabling pain); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) ("failure to seek aggressive treatment is not suggestive of disabling . . . pain"). Finally, no physician, including Drs. Fagan and Weltmer, restricted the range of activities Young could do with her left arm. This supports the ALJ's determination that Young could engage in frequent pushing and pulling with her left arm.[15] *See Masterson v. Barnhart*, 363 F.3d 731, 739 (8th Cir. 2004) (in determining RFC, ALJ may properly rely on fact that no treating doctor restricted claimant's daily activities).

**B.**     ***The Hypothetical Posed to the Vocational Expert Was Properly Formed***

Young argues that the hypothetical posed by the ALJ to the vocational expert failed to capture the concrete consequences of her impairments, and therefore, the expert's response does not constitute substantial evidence upon which the ALJ's decision can properly rest. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (hypothetical question should capture the "concrete consequences" of those impairments). Specifically, Young contends that the ALJ

---

[15]  Even assuming *arguendo* that the ALJ's determination was erroneous, it would be harmless. *See case* (harmless error). Neither of the jobs Young had previously performed, building manager or data-entry clerk, requires frequent pushing or pulling. *See* Dictionary of Occupational Titles, §§ 187.167-190 and 203.582-054.

erred by failing to make explicit findings about the mental demands of her past work or to determine how her mental limitations affected her RFC.

Even though the ALJ properly determined Young's mental impairments were not severe, *see supra*, he was required to consider their impact on Young's maximum RFC. *See* 20 C.F.R. § 404.1545. Though he did not explicitly "list and reject" the possibility that Young's non-severe mental impairments affected her RFC, such a task is not required. *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). By virtue of his thorough discussion of Young's depression and anxiety when he evaluated their severity, the ALJ implicitly found that they imposed no limitations on her RFC. *See, e.g., id.; Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004) ("The ALJ's decision not to incorporate [claimant's mild impairment] in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment."); *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (hypothetical question may omit non-severe impairments). Because Young's mental impairments did not cause any functional limitations, the hypothetical questions posed to the vocational expert were not required to include them. *See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) ("The ALJ's hypothetical

question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.").

In arguing that the hypothetical question did not capture the concrete consequences of her impairments, Young relies on *Pfitzer v. Apfel*, 169 F.3d 566 (8th Cir. 1999). In that case, the Eighth Circuit reversed and remanded because the ALJ had failed to make specific findings as to the claimant's RFC and the demands of his past work. The *Pfitzer* ALJ stated only that the claimant retained the RFC "to perform a wide range of medium work," without defining the contours of that work, and failed to identify whether the claimant had any physical limitations. He also found that the claimant could return to his job of truck driver without identifying which type of truck driving he was engaged in.

In contrast, the ALJ here defined Young's RFC carefully, describing in detail the environmental and physical limitations Young had as well as the precise job titles correlated to her prior work. (*See* Tr., pp. 18–19.) Unlike in *Pfitzer*, the ALJ also examined both Young's physical and mental impairments. (*See* Tr., p. 14 (relying on evidence to support conclusion that Young's depression and anxiety were non-severe). The hypothetical questions the ALJ posed to the vocational expert were properly formed and therefore constitute substantial evidence for his

conclusion that Young could return to her past work as a building manager and a data-entry clerk. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 2006).

## VII. __Conclusion__

Based on the foregoing, I conclude that there is substantial evidence on the record to support the Commissioner's decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 11th day of March, 2014.